# PRODUCT SERVICES AGREEMENT

This Product Services Agreement (this **"Agreement"**) is made and entered into as of - March 30, 2021 (**"Effective Date"**) by and between The S Group, Inc., an Oregon corporation (**"S Group"**) and Western Rise, a Colorado corporation (**"Customer"**).

## RECITALS

A.   Customer has developed designs of the Customer Products (as defined herein), and wishes to engage the S Group in connection with the execution and delivery of the Customer Products.

B.   Customer desires to locate a manufacturing facility to complete the development and manufacture of the Customer Products line for sale and distribution by Customer.

C.   The S Group provides services to identify development and manufacturing facilities worldwide and to facilitate the formation of manufacturing and procurement relationships. The S Group also provides design services.

D.   Customer desires to receive from S Group and S Group desires to provide to Customer the services as specified in this Agreement.

## AGREEMENT

**SECTION 1.   DEFINITIONS**

Capitalized terms not specifically defined in this Section 1 will have the meaning ascribed to them as set forth elsewhere in this Agreement. The following terms have the following meanings:

**"Customer Products"** means Customer's apparel and accessories as more fully described in **Exhibit A**, attached hereto and incorporated herein by this reference. Additional products may be added to **Exhibit A** upon mutual written agreement.

**"Design Services"** means all services as fully described in **Exhibit B** attached hereto and incorporated herein by this reference.

**"Manufacturer"** means a Third-Party that performs manufacturing, design, production, import or export, quota management or procurement services related to the Customer Products.

**"Related Entity"** means any Third-Party which controls, is controlled by, or is under common control with a party. For purposes of this definition, "control" means having (i) direct

or indirect ownership of more than fifty (50%) percent of the voting equity or beneficial interest; (ii) the right to vote for or appoint a majority of the board of directors or other governing body; or (iii) management or operational control.

**"Third-Party"** means any individual, corporation, partnership, limited liability company, trust, estate, association, governmental authority or other entity that is not a party to this Agreement.

## SECTION 2.    SERVICES

**2.1    Services**.  Subject to the terms and conditions of this Agreement, S Group will assist Customer in product development, price negotiations, production scheduling, quality assurance and supply chain management, and will assist in locating freight forwarders where requested.

**2.2    Design Services**. S Group may also from time to time at the request of Customer provide Design Services as described in **Exhibit B** in relation to Customer Products.  The rate of compensation for Design Services is set forth in **Exhibit B**.

**2.3    Cooperation**.  Customer agrees to provide all information and cooperation, at Customer's sole expense, to S Group as reasonably necessary to: (i) enable S Group to perform its obligations under this Agreement; and (ii) facilitate the formation of an agreement for production and manufacturing services between Customer and potential Manufacturers identified or referred to Customer by S Group.  Such information and cooperation by Customer shall include without limitation providing S Group with a reasonable quantity of Customer Product samples, designs, specifications, anticipated resale price, quality control standards and projected monthly quantities.

**2.4    Relationship of the Parties**.  The relationship of Customer and S Group established by this Agreement is that of independent contractors.  Nothing in this Agreement shall be construed to: (i) give either party any right to direct or control any day-to-day activities of the other, (ii) constitute the parties as partners, joint ventures, co-owners or as participants in any joint undertaking; or (iii) give either party the authority to make any commitment whatsoever for or on behalf of the other party.  All financial and other obligations associated with either party's business are and shall be the sole responsibility of such party.  Each party agrees and acknowledges that S Group is not an employee or agent of Customer.  S Group agrees that it shall not represent that it is an employee or agent of Customer.  S Group hereby acknowledges and agrees that it shall not be entitled to workers' compensation, retirement benefits, insurance, or other benefits provided by Customer to employees of Customer.

## SECTION 3.    COMPENSATION AND PAYMENT TERMS

**3.1    Compensation**.  Customer will pay S Group amounts for the Customer Products as specified in invoices that the S Group will issue in connection with purchase orders for Customer Products.

**3.2    Payment Terms**.  Unless otherwise indicated on an invoice, compensation will be due and payable at 30% on placement of purchase order with S Group with remainder at the date the product is shipped from the respective factory (X-Factory date).  All payments will be made in U.S. dollars either sent to S Group as specified in Section 13 or by bank-to-bank wire transfer as reasonably requested by S Group.  Any payments not received by S Group within 15 days of their due date will incur a late charge equal to 1.5% per month or the highest rate allowed by law, whichever is lower.  S Group will be deemed to have earned the compensation as to any Customer Product shipment at the time such Customer Products are delivered LDP (landed, duty-paid).

**3.3    Security Interest**.  Customer hereby grants S Group a security interest in all Customer Products purchased hereunder (including without limitation Irregular Products and Excess Products) and the proceeds thereof to secure Customer's payment obligations to S Group under this Agreement. Customer acknowledges that the security interest granted under this Section 3.3 is a purchase money security interest under the Uniform Commercial Code of the state the law of which is applicable to the attachment and perfection of, and realization on, a security interest in the Customer Products (the "**UCC**"). S Group may file one or more financing statements perfecting such security interest and continuations, amendments, restatements and modifications thereof and Customer shall promptly execute any such statements or other documentation necessary to perfect S Group's security interest in such Customer Products.  With respect to the security interest granted under this Section 3.3, S Group shall have all rights of a secured party under the UCC, and, in addition, Customer hereby grants to S Group a non-exclusive, perpetual, irrevocable, royalty-free, worldwide license to the Customer Intellectual Property solely with respect to the promotion, advertising, marketing, distribution, sale and resale of the Customer Products by S Group in connection with the exercise of its rights as a secured party to promote, advertise, market, distribute, sell and resell collateral under the UCC.

## SECTION 4.    QUALITY STANDARDS

**4.1.    Specifications**.  S Group will deliver Customer Products meeting the specifications of Customer as set forth in **Exhibit A** (with allowance for customary variances) (the "**Specifications**").  **Except as set forth on Exhibit A, S Group expressly excludes all warranties, express and implied, including but not limited to the warranty of merchantability, the warranty of fitness for a particular purpose, and any warranties that may have arisen from course of dealing or usage of trade.**

**4.2     Irregular Products**.  Customer Products that do not meet the Specifications as set forth in **Exhibit A** (with allowance for customary variances) shall be referred to herein as "**Irregular Products**".

**4.3     Excess Products**.  Customer will accept production runs from a Manufacturer's factory plus or minus 3% of the total quantity per purchase order per factory.  Customer Products delivered in excess of 103% of the total quantity per purchase order per factory shall be referred to herein as "**Excess Products**".

**4.4     Inspection**.  Customer shall inspect Customer Products within thirty (30) days of receipt ("**Inspection Period**") and either accept or, if such Customer Products are Irregular Products or Excess Products, reject such Irregular Products or Excess Products. Customer will be deemed to have accepted Customer Products unless it notifies S Group in writing of any Irregular Products or Excess Products during the Inspection Period and furnishes such written evidence or other documentation as reasonably required by S Group. If Customer timely notifies S Group of any Irregular Products or Excess Products, S Group shall determine, in its sole discretion, whether the Customer Products are conforming Customer Products, Irregular Products or Excess Products. If S Group determines that the Customer Products are Excess Products, it shall refund the compensation paid by Customer to S Group for such Excess Products promptly upon receipt by S Group of the Excess Products.  If S Group determines that the Customer Products are Irregular Products, then in S Group's sole discretion:

(a)     Customer will be obligated to accept Irregular Products up to the following quantities: (i) 1% of a printed T-shirt order; or (ii) 2% of the total order for all other apparel and accessories, provided, however, that Customer shall pay compensation for such Irregular Products at 50% off the prices set forth in **Exhibit A**; and

(b)     as to the Irregular Products not purchased by Customer pursuant to Section 4.4(a), S Group shall in its sole discretion either (i) replace such Irregular Products with conforming Customer Products, or (ii) refund the compensation paid by Customer to S Group for such Irregular Products, in each of (i) or (ii), promptly upon receipt by S Group of the Irregular Products.

**SECTION 5.          REPRESENTATION, WARRANTY AND COVENANT OF CUSTOMER**

**5.1     Intellectual Property**.  No trademark, copyright, or other design or creative work used by Customer on any Customer Product ("**Customer Intellectual Property**") infringes the trademark, copyright, or other intellectual property rights of any Third Party.

**SECTION 6.          INDEMNIFICATION**

**6.1     Manufacturer Errors**.  Neither S Group nor any S Group Related Entity will in any way be responsible for or liable to Customer or any Third-Party for any errors or omissions committed by any Manufacturer, unless such errors or omissions are a direct result of S Group

or any S Group Related Entity's material misrepresentation or gross negligence.

**6.2    Indemnification Obligations of Customer**.  Customer will indemnify and defend S Group and any S Group Related Entity from and against any claim brought against S Group or any S Group Related Entity by Customer or a Third-Party that it is: (i)  based on Customer's or any Customer Related Entity's failure to pay a Manufacturer; (ii) based on or connected with of any breach of a representation, warranty or covenant in Section 5; (iii) based on the ownership of or right to use any Customer Intellectual Property in connection with the Design Services; or (iv) based on errors or omissions of Manufacturers as described in Section 6.1.

**6.3    Indemnification Obligations of S Group**.  S Group will indemnify and defend Customer and any Customer Related Entity from and against any claim brought against Customer or any Customer Related Entity by a Manufacturer or other Third Party that is: (i) based on a material or intentional misrepresentation by S Group or any S Group Related Entity to a Manufacturer while S Group is performing pursuant to this Agreement; and (ii) based on theories of product liability, personal injury, or property damage that is caused by a Customer Product supplied pursuant to this Agreement which fails to meet the Quality Standards set forth in Section 4 and **Exhibit A** of this Agreement; however, S Group will not be obligated to indemnify Customer or a Customer Related Entity in connection with any Customer Product sold by Customer or a Customer Related Entity which Customer or such Customer Related Entity knows is defective at the time of sale or which is an Irregular Product.

**6.4    General**.  Neither party ("**Indemnitor**") shall have any obligation under this Section 6 to defend, indemnify or hold harmless the other party ("**Claimant**") unless Claimant (i) provides Indemnitor with prompt written notification of the claim; (ii) provides Indemnitor with all reasonable information and assistance, at Indemnitor's expense, to defend or settle the claim; and (iii) grants Indemnitor authority and sole control of the defense or settlement of such claim.  Claimant reserves the right to retain counsel, at Claimant's expense, to participate in the defense and settlement of any such Claim.  Indemnification obligations under this Section 6 will include damages finally awarded or paid in settlement, costs and expenses (including but not limited to reasonable fees for attorneys and other professionals) arising from any claim subject to indemnification hereunder.

### SECTION 7.    TERM OF AGREEMENT AND TERMINATION

**7.1**    The term of this Agreement shall be effective as of the Effective Date and shall continue for 36 months.  This Agreement shall renew automatically for an additional term of 36 months, unless notice of non-renewal is given to the other party at least 90 days prior to the expiration of this Agreement.

**7.2** Either party may terminate this Agreement if the other party materially breaches this Agreement and fails to cure that breach within thirty (30) days after receiving written notice of the breach.

**7.3** <u>Sections 3, 4, and 8 through 16</u> will survive any expiration or termination of this Agreement.

**SECTION 8.      ENTIRE AGREEMENT; MODIFICATION**

This Agreement constitutes the entire understanding of the parties and shall supersede any other oral or written agreements. This Agreement may not be modified in any way without the written consent of both parties.

**SECTION 9.      ASSIGNMENT**

Neither party may assign or transfer the rights or delegate any duties under this Agreement without the prior written consent of the other party, which consent will not be unreasonably withheld or delayed. Notwithstanding the foregoing, neither party will be required to obtain the other party's consent to assign and delegate this Agreement in its entirety to a Third-Party that is purchasing all or substantially all of the assigning party's assets or capital stock. All terms and provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective transferees, successors and assigns. Any assignment, transfer or delegation of any of the rights or obligations under this Agreement in violation of the foregoing is null and void.

**SECTION 10.     CHOICE OF LAW**

This Agreement shall be interpreted according to the laws of the state of Oregon, excluding its conflicts of law rules.

**SECTION 11.     LIMITATION OF LIABILITY**

EVEN IF ANY REMEDY SET FORTH HEREIN FAILS OF ITS ESSENTIAL PURPOSE OR OTHERWISE AND REGARDLESS OF WHETHER A CLAIM ARISES UNDER CONTRACT, TORT (INCLUDING NEGLIGENCE), BREACH OF WARRANTY, STRICT LIABILITY OR OTHERWISE, AND WHETHER OR NOT EITHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGES, IN NO EVENT: (i) SHALL EITHER PARTY BE LIABLE FOR ANY SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL LOSS OR DAMAGES OF ANY KIND (INCLUDING LOSS BUSINESS OR PROFITS); (iii) NOR SHALL EITHER PARTY'S TOTAL CUMULATIVE LIABILITY HEREUNDER EXCEED THE TOTAL AMOUNT PAYABLE TO S GROUP PURSUANT TO THIS AGREEMENT. The parties expressly agree that the allocation of risk contained in this Section is an essential basis of this Agreement.

## SECTION 12.    CONFIDENTIALITY

**12.1**   Each party acknowledges that that the other's non-public information, including, without limitation, price lists, pricing information, customer lists, manufacturing contacts, financial information, product information, product plans, marketing plans, and marketing strategies, constitute confidential information ("**Confidential Information**") that (i) is valuable and confidential information of the disclosing party, and (ii) is and shall remain the sole and exclusive property of the disclosing party.  Each party further acknowledges that the disclosing party shall have, in addition to other remedies available at law, the right to enjoin the use or disclosure of such party's Confidential Information in violation of this Agreement.

**12.2**   Neither party shall use or disclose to any Third-Party any Confidential Information except as reasonably necessary to perform its obligations or exercise its rights under this Agreement.  Upon any termination or expiration, both parties will return to the other party all tangible Confidential Information disclosed by the other party and will immediately cease all use of the other party's Confidential Information.

**12.3**   Confidential Information shall not include any information which (i) is or becomes publicly available without fault of the receiving party; (ii) is independently developed by the receiving party without use or access to the disclosing party's Confidential Information; or (iii) was known to the receiving party prior to its receipt of the Confidential Information from the disclosing party and is not subject to other restriction on disclosure.

## SECTION 13.    NOTICES

All notices, requests, consents and other communications required or permitted hereunder shall be in writing and shall be delivered personally (in which case it shall be deemed given when delivered), mailed by certified or registered mail, postage prepaid, return receipt requested (in which case it shall be deemed given one (1) week after mailing) or sent by facsimile, with a confirmation copy simultaneously mailed (in which case it shall be deemed given when transmitted), at the addresses indicated below.  Notice of change of address shall be given in the same manner as other communications.

If to Customer:

_____
_____
_____
Facsimile Number: (\_\_\_) _____

If to S Group:

621 SW Alder St., Suite 900

        Portland, OR  97205
        Facsimile Number: (503) 328-0181
        Attn: Gary Peck

**SECTION 14.  DISPUTES AND ARBITRATION**

The parties agree that any dispute arising hereunder, including the construction or application of this Agreement, shall be settled by arbitration in accordance with the rules of the Arbitration Service of Portland, then in force, and that all arbitration hearings shall be held in Portland, Oregon.  If the parties cannot agree upon a arbitrator within ten (10) days after demand by either of them, either or both parties may request the American Arbitration Association to name a panel of five (5) arbitrators.  Customer shall then strike the names of two (2) on the list, the S Group shall then strike two (2) names, and the remaining name shall be the arbitrator.  The decision of the arbitrator shall be final and binding upon the parties both as to law and to fact, and shall not be appealed to any court in any jurisdiction.  Any court of competent jurisdiction may, however, enter judgment in accordance with the arbitrator and entertain all proceedings for enforcement of such judgment.  The expense of the arbitrator shall be shared equally by the parties, unless the arbitrator determines that the expenses shall be otherwise assessed.

**SECTION 15.  SEVERABILITY**

If any portion of this Agreement shall be determined to be illegal or otherwise unenforceable in any circumstance by any arbitrator or judge, such determination shall not affect the validity of any other provision hereof or the validity of the provision in question as to any other circumstance.

**SECTION 16.  HEADINGS**

The section headings contained in this Agreement are included for convenience only and shall not limit or otherwise affect the terms hereof.

**Effective Date:**  March 30, 2021

| **Customer:** | **The S Group:** |
|---|---|
| By: _Kelly Watters_ (Signature) | By: _Elizabeth Rogers_ (Signature) |
| Name:  Kelly Watters | Name:  Elizabeth Rogers |
| Title:  Kelly Watters | Title:  COO |

PDX/115117/147603/DLH/1405961.1
92372206.2 0047189-00001

**EXHIBIT A**
**to**
**Product Services Agreement**

<u>**Customer Products**</u>

Detailed assortment plan to be agreed on.

**EXHIBIT B**
to
**Product Services Agreement**

### Design and Development Services

- **Product and Material Innovation & Design Services:**
    - Collaborate on Merchandising plan for product launch and propose roll-out styles.
    - Consultation in connection with direction and inspiration of the Customer Products and related design aesthetics.
    - Design a comprehensive selection of custom sundries and trims.
    - Based on all brand and design input, develop a methodical approach to consistent branding.
    - Present all styles in a distinctive and recognizable look and mood.

    Materials, fabrication, trims and sundries
    - Develop and/or use current fabrics that will be applicable to the brand. Estimate approx $5,000 in development costs (sample yardage, courier and testing fees) to be used on bulk order when completed. These costs to be billed as incurred and only after client approval.
    - Design and Develop a series of branded sundries illustrating all brand design attributes.
    - Ensure all materials have technical attributes.
    - All fabrications need to speak to comfort, functionality and easy care.
    - Where possible build intellectual property for material concept exclusivity.

- **Product Development Services:**
    - Preparation of silhouettes, constructions and technical drawings for the products.
    - Development of styles, ornamentation and all required components and hardware for each construction/silhouette of the Customer Products.
    - Design and present Customer Products into SKU plan and determined colorways.
    - Build product technical inclusive tech packs.
    - Bill of materials.
    - Manufacturing assembly.
    - Product embellishment.
    - Product size range.
    - Product size grading.
    - Build patterns indigenous to your brand or other sizing/fitting specifications requested by Customer.
    - Build up to 2 prototypes until customer approved to size range.
    - Build product size ranges on completion and sign off of design and development.
    - Preparation of specifications for final palette and materials and detail all style specifications (specs) for subsequent sample preparation.

- o Any other related services that the Customer reasonably determines are necessary and appropriate in order to give full effect to the terms of the Agreement.

**Customer Product Manufacturing Services**

Samples above and beyond 2 protos, 1 size set, 1 Pre-Production sample will be billed at 2 x COST. These are generally product testing samples or extra samples required for marketing.

- o Products to be manufactured in specialized factories
- o All factories are WRAP certified, FLA and ISO 9001 compliant
- o Production capacity planning
- o Lead-time management
- o Just in time work in progress management
- o 1.5 AQL quality assurance process
- o Shipment to point of destination
- o Minimum order quantities:
    - o Fabric Mill: based on custom minimums for dye lots and specialty yarns, surcharges may apply if quantities are below and the balance fabric is not used up within 90 days.
    - o Garment Manufacturing: 600/ color, 1200/style. Surcharges will apply if below MOQs.

COST BUDGET

Monthly retainer of $6,500 for a 12-month contract, to be renewed on a month-to-month basis, with at least 30 days notice of any requests to alter or discontinue.

Innovation and Development of Materials & Trims

Product Design

Apparel Development & Re-Sourcing, inclusive of fabric and/or design consultation in relation to elevating materials/ product wherever possible.

Merchandise Planning

Material Trend and Innovation Research

Courier: Invoiced as used or we can use customer's account.

TIMELINE

Timeline to be created once scope of partnership is defined.